Karl DAVID and John David, Plaintiffs,

v.

Kenneth G. MOSLEY, in his personal capacity and Taylor V. Blanton, in his personal capacity, Defendants.

Civil Action No. 3:95cv346.

United States District Court, E.D. Virginia, Richmond Division.

Feb. 16, 1996.

---

Richard E. Gardiner, Fairfax, Virginia, for plaintiffs.

Robert W. Jaspen, Assistant U.S. Attorney, Richmond, Virginia, for Mosley.

Francis W. Pedrotty, III, Grace M. Diliberto, Office of the Attorney General, Richmond, Virginia, for Blanton.

## MEMORANDUM OPINION

PAYNE, District Judge.

Karl David ("Karl"), a federally-licensed firearms dealer, and his son, John David ("John") initiated this action for monetary damages against Kenneth G. Mosley, Jr. ("Mosley"), a Special Agent employed by the Bureau of Alcohol Tobacco and Firearms ("BATF"), pursuant to *Bivens v. Six Un-*

*known Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and against Taylor V. Blanton ("Blanton"), a Virginia State Police officer on special assignment to BATF, pursuant to 42 U.S.C. § 1983.[1] The Complaint alleges that the defendants violated the constitutional rights of Karl and John to be secure against unreasonable searches and seizures.

## STATEMENT OF FACTS

On October 6, 1993, Karl, who was then a federally licensed firearms dealer, was indicted by a Caroline County grand jury for embezzlement, a crime punishable by a term of imprisonment for up to 20 years.[2] On March 23, 1994, as required by 18 U.S.C. § 924, Karl submitted BAFT Form 8, Renewal of Firearms License, to the BATF in an effort to renew his federal firearms license for Karl's Gun Shop in Milford, Virginia. One question on that form asked: "Are you presently under indictment or information in any court for a crime punishable by imprisonment for a term exceeding one year?" Notwithstanding the pending state court indictment on charges of embezzlement, Karl responded in the negative.

On April 19, 1994, Mosley received information that Karl was receiving guns in interstate commerce. Because Karl was under indictment for a felony, receipt of such weapons violated federal law. 18 U.S.C. § 922(n). Mosley decided to monitor Karl's actions and, in furtherance of that objective, Mosley instructed Blanton to have the United Parcel Service ("UPS") notify Mosley or Blanton when UPS received any packages for Karl's Gun Shop.

On April 21, 1994, Robert Martinson, the UPS Loss Prevention Supervisor in Richmond, informed Blanton that UPS in Fredericksburg had received two packages destined

for Karl's Gun Shop, one from a gun shop in Norfolk and another from a gun collector in North Carolina. Kenneth Tickle, manager of the Fredericksburg UPS office, decided to open the package from the Norfolk gun shop[3] and discovered a Smith and Wesson .38 caliber pistol. On April 24, 1994, Blanton went to the Fredericksburg UPS office to x-ray the package from North Carolina, but found that it had already been delivered to Karl's Gun Shop.

On April 26, 1994, Martinson reported to Mosley and Blanton that UPS had received two more packages for Karl's Gun Shop, one from a firearms dealer in Ohio and one from a firearms dealer in Iowa. Mosley and Blanton determined in a telephone conversation with the Ohio shop that the Ohio package contained a Russian Makarov $9 \times 18$ caliber pistol. From the Iowa firearms dealer, they learned that the Iowa package contained gunsmithing supplies and equipment.

Also, on April 26, 1994, Mosley obtained permission to make a "controlled delivery" to Karl's Gun Shop while posing as a UPS delivery driver. An Assistant United States Attorney, George Metcalf ("Metcalf"), authorized the use of electronic surveillance during the "controlled delivery." Mosley and Martinson then delivered the packages to Karl while Blanton monitored the communications from a remote location. Karl acknowledged receipt of the packages by signing a UPS form.

After Mosley informed Metcalf that the packages had been delivered, Metcalf presented the foregoing facts, including the receipt of the Makarov pistol, to a grand jury, which charged Karl with making a false statement in a firearms license renewal application in violation of 18 U.S.C. § 924(a)(1)(A), and for receipt of firearms in violation of 18 U.S.C. § 922(n). The indictment was returned on May 4, 1994.

---

**1.** The Complaint also named Caroline County, the Caroline County Sheriff and a deputy as defendants. The plaintiffs voluntarily agreed to dismiss the action as to those defendants. At the same time, the plaintiffs abandoned their request to add the Sheriff's Office as a defendant.

**2.** Virginia Code § 18.2–111. Karl was acquitted of this charge on September 14, 1994.

**3.** The plaintiffs allege that Tickle acted pursuant to instructions from Blanton. Blanton states that he never instructed Tickle to open either package because he had alternative methods of determining their contents. The record contains no statement from Tickle. However, the plaintiffs have offered no refutation to Blanton's affidavit. Hence their unfounded, conclusory assertions to the contrary are defeated by Blanton's specific affidavit.

Also, on May 4, 1994, Mosley applied for a search warrant on the basis that, in violation of 18 U.S.C. § 922(n), Karl was receiving guns while under indictment for a felony. Based upon Mosley's affidavit, United States Magistrate Judge David G. Lowe issued a warrant authorizing the search of Karl's Gun Shop. The warrant authorized seizure of documents, including firearms licenses, applications for licenses, firearms acquisition and disposition records, and other records denoting "the purchase, receipt, ordering, and shipment of firearms since October 6, 1993, and all firearms received and purchased since October 6, 1993."

On May 5, 1994, Mosley and Blanton, along with three other officers, executed the search warrant at Karl's Gun Shop. According to Blanton and Mosley, they attempted to seize only firearms purchased after the date of the state court indictment (October 6, 1993) or firearms which were not listed in the Acquisition and Disposition ("A & D") Book maintained at Karl's Gun Shop. However, notwithstanding a four to six hour review of Karl's records, Blanton and Mosley were unable to match all the guns with A & D listings. According to Blanton and Mosley, Karl told them to "just take the guns." Mosley Aff. ¶ 7; Blanton Aff. ¶ 32. Karl, however, denies that he gave the officers permission to take the unidentified guns and, in fact, asserts that he told Blanton and Mosley that certain of the guns were purchased well before October 6, 1993. Karl David Aff. ¶ 8; John David Aff. ¶ 16.

Out of approximately 50 guns on the premises of Karl's Gun Shop on May 5, 1995, 26 were seized. During the search, Mosley located documentary proof that Karl had acquired 11 of the 26 seized weapons after the October 6, 1993 state indictment. In addition, because of the April 26, 1994 "controlled delivery," Mosley already was aware that Karl had acquired a twelfth weapon, the Russian Makarov, from Ohio for which no acquisition documents were located in the A & D records.

Review of the A & D records during the search failed to disclose documents reflecting the acquisition date of 14 other weapons. The failure of Karl's A & D records to disclose the information required by law for those "14 other weapons" even after a lengthy review of the records was, in Mosley's view, justification to seize the undocumented weapons pending further review of the records. Mosley also thought that Karl had consented to the removal of the weapons for that purpose. Subsequent review of the seized A & D records disclosed that 8 of these "14 other weapons" were, in fact, acquired by Karl after October 6, 1993. That review also disclosed that one of the "14 other weapons" had been purchased before October 6, 1993; and, because it was outside the scope of the warrant, it was returned to Karl. The subsequent examination of the A & D records failed to confirm an acquisition date for 5 of the "14 other weapons." [4]

## PROCEDURAL HISTORY

On May 5, 1994, Karl was arrested and charged with the crimes set forth in the May 4, 1994 indictment. Subsequently, a gun shop in Ohio notified Metcalf that, on several occasions between November 2, 1993 and April 22, 1994, it had received orders for firearms from Karl's Gun Shop. Consequently, six additional counts were added in a superseding indictment which was returned on June 20, 1994. The superseding indictment, like the original indictment, charged Karl with making a false statement in a firearms renewal application in violation of 18 U.S.C. § 924(a)(1)(A) and with receiving on four occasions a firearm shipped in interstate commerce by a person under indictment for a crime punishable by a term of imprisonment exceeding one year in violation of 18 U.S.C. § 922(n). In addition, Karl was charged with making a false statement to the United States in violation of 18 U.S.C. § 1001.

On July 8, 1994, the court, on the motion of the United States, dismissed the four counts of receiving a firearm while under indictment. On July 27, 1994, the court dismissed,

---

4. On June 19, 1995, the court dismissed the civil action of the United States seeking forfeiture of the 14 unrecorded firearms seized from Karl's Gun Shop because it was untimely filed. The United States appealed from the June 19 Order and the court stayed the matter pending appeal.

also at the instance of the United States, the count alleging that Karl falsely represented that he was not under indictment when he applied for renewal of his federal firearm dealer's license. On July 29, 1994, Karl was tried and convicted of the remaining count, the making of a false statement to the United States in violation of 18 U.S.C. § 1001.

On May 4, 1995, Karl and John filed this seven count civil action alleging violation of their constitutional right to be secure against unreasonable searches and seizures. Apparently, John's only interest is that he resided in Karl's home which also housed Karl's Gun Shop at the time of the search.

Count I alleges that the search was based upon a warrant which had been issued without probable cause. The theory of Count I is that there was no probable cause to apply for, or support issuance of, a search warrant because 18 U.S.C. § 925(b) provides an exception to § 922(n) for licensed firearms dealers, such as Karl, to continue operation under an existing license if a timely renewal application is made, even if the application contains false information. This theory is also the linchpin of Counts II and IV. Thus, Count II asserts that the seizure of the 26 firearms from the Davids' home was in violation of the Fourth Amendment because the warrant had been issued without probable cause for the reasons stated in Count I. And, Count IV asserts that all documents seized incident to the search were taken in violation of Karl's Fourth Amendment rights because the warrant had been issued without probable cause for the reasons set forth in Counts I and II.

Counts III and V focus on acts allegedly exceeding the scope of the warrant. Count III claims that 6 of the 26 seized firearms had been received before October 6, 1993, and were thus outside the scope of the seizure authorized by the warrant.[5] Count V asserts that documents were seized relating to firearms transactions occurring before October 6, 1993, putting them outside the scope

of the warrant.[6] Count VII asserts that Blanton violated Karl's Fourth Amendment rights by directing, under color of law, a UPS employee to open packages addressed to Karl's Gun Shop without legal authority to do so.

Mosley asserts that, as to Counts I, II, and IV, he enjoys qualified immunity and therefore is entitled to judgment on the pleadings under Fed.R.Civ.P. 12(c). Mosley's motion for judgment on the pleadings relies, in part, on matters beyond the pleadings and hence must be considered as seeking summary judgment under Fed.R.Civ.P. 56. Mosley also seeks summary judgment on Counts III and V on the merits and because of qualified immunity.

Blanton seeks summary judgment on the theory that he is entitled to qualified immunity for Counts I, II, III, IV, and V. Presumably pursuant to Fed.R.Civ.P. 12(b)(6), Blanton seeks dismissal of Count VII for failure to state a cognizable claim because the opening of a package by a UPS employee does not state a cause of action under § 1983, which requires state action. Because Blanton's motion respecting Count VII relies in part on matters beyond the pleadings, it too must be considered as seeking summary judgment under Fed.R.Civ.P. 56.

## DISCUSSION

Although the motions of Mosley and Blanton overlap substantially, they are sufficiently different to warrant separate consideration. For the reasons which follow, the motions for summary judgment are granted.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is to be rendered "if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

**5.** Count III originally alleged that the seizure of 7 firearms exceeded the scope of the warrant. However, in the course of discovery, the plaintiffs determined that there were only 6 such firearms.

**6.** Count VI originally asserted that Caroline County failed to train and supervise employees of the Sheriff's Department in the execution of federal warrants but that count has since been abandoned.

moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The rules further provide:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

It is the responsibility of the party seeking summary judgment to inform the court of the basis for its motion, and to identify the parts of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 216 (4th Cir.1987). "[W]here the non-moving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories and admissions on file.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The moving party may also use affidavits to support its motion. In response, the non-moving party must go beyond the pleadings and, by citing its own affidavits or by citing "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* Opposition to a properly documented summary judgment motion may not be based solely on the pleadings. *Id.*

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis added). It is the function of the district court not to weigh the evidence, but to determine whether there is a genuine issue for trial, and "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511 (citations omitted). Hence, summary judgment is appropriate if the evidence is "merely colorable" or "not significantly probative." *Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted). The standard for summary judgment mirrors the standard for directed verdict (now judgment as a matter of law) under Rule 50(a), Fed.R.Civ.P., the principal difference being procedural. *Id.* at 251, 106 S.Ct. at 2511–12. And, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). The non-moving party, however, "need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514. The district court also "must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. at 2513.

Furthermore, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. Summary judgment is appropriate only if, upon consideration of the record as a whole, a reasonable trier of fact could not find for the non-movant. *Allstate Fin. Corp. v. Financorp, Inc.*, 934 F.2d 55, 58 (4th Cir.1991). But, where a faithful examination of the record establishes the absence of a genuine issue of material fact, it is "the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987); *see also Guinness PLC v. Ward*, 955 F.2d 875, 883 (4th Cir.1992). With these principles in mind, the court will consider the motions filed by Mosley and Blanton.

## A. Mosley's Claim Of Qualified Immunity: Counts I, II And IV

Mosley seeks summary judgment on Counts I, II and IV, on the theory that he is entitled to qualified immunity.

■ The Supreme Court of the United States has determined that law enforcement officials are entitled to a qualified immunity from personal civil liability under 42 U.S.C. § 1983 in large measure because of the complex tasks performed by such officials. *Taylor v. Farmer*, 13 F.3d 117, 120 (4th Cir. 1993).[7] Thus, in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738.

Applying that principle to determine whether an official is entitled to qualified immunity in a suit alleging Fourth Amendment violations, the Supreme Court, in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), held that immunity from civil liability exists so long as the official's "actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* at 638, 107 S.Ct. at 3038. In that regard, the Court explained that:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of pre-

existing law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039.

■ Thus, the doctrine of qualified immunity extends to law enforcement officers a margin of error "when they navigate uncharted areas at the margins of constitutional criminal law." *Tarantino v. Baker*, 825 F.2d 772, 774 (4th Cir.1987).[8] This is because "... there are two levels on which the immunity shield operates. First, the particular right must be clearly established in the law. Second, the manner in which the right applies to the actions of the official must also be apparent." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir.1992), *cert. denied*, 506 U.S. 1080, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993). Therefore, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.*

■ The availability of qualified immunity is determined against a standard of objective reasonableness. *See Davis v. Scherer*, 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984). As the Court of Appeals for the Fourth Circuit has observed, "[t]he Supreme Court's decisions place a special emphasis on the reasonableness of an officer's actions, requiring courts to make an objective inquiry into the facts facing the officer at the time of the alleged improper act." *Taylor v. Farmer*, 13 F.3d at 120. Consequently, whether an official may be held personally liable for unlawful official action turns on "the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. at 639, 107 S.Ct. at 3038; *see also Price v. Sasser*, 65 F.3d 342, 345 (4th Cir.1995). And, the law "must be sufficiently clear that a reasonable officer would have known that *his actions* violated the law." *Amato v. City of Richmond*, 875

---

7. The claims against Mosley (and, in reality, those against Blanton) are against federal officials under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), but the principles applicable in § 1983 actions also apply in *Bivens* actions.

8. The Supreme Court's decision in *Horton v. California*, 496 U.S. 128, 130, 110 S.Ct. 2301, 2304, 110 L.Ed.2d 112 (1990) abrogated *Tarantino* insofar as *Tarantino* limited the plain view doctrine to inadvertent discoveries. *Horton* does not, however, affect those parts of *Tarantino's* holding cited herein.

F.Supp. 1124, 1142 (E.D.Va.1994) (emphasis in original).

■■■ Claims of qualified immunity are appropriate for resolution on summary judgment because immunity is an "entitlement not to stand trial or face other burdens of litigation." *Turner v. Dammon,* 848 F.2d 440, 443 (4th Cir.1988). The Supreme Court has explained the task of a district court presented with a claim of qualified immunity on a motion for summary judgment as follows:

> On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.... If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

*Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738. Viewed, then, in the proper context, the determination of a defense of qualified immunity involves three distinct steps:

> (1) identification of the specific right allegedly violated; (2) determining whether at the time of the alleged violation the right was clearly established; and (3) if so, then determining whether a reasonable person in the officer's position would have known that doing what he did would violate that right.

*Simmons v. Poe,* 47 F.3d 1370, 1385 (4th Cir.1995).

In this action, the specific right allegedly violated is said to be found in an exception to 18 U.S.C. § 922(n), a *general prohibition* against the interstate shipment or transport of firearms by any person under indictment for a crime punishable by imprisonment for a term exceeding one year. The exception to this prohibition is found in 18 U.S.C. § 925(b) which provides that:

> [a] licensed ... dealer ... who is indicted for a crime punishable by imprisonment for a term exceeding one year, may ... continue operation pursuant to his existing license (*if prior to the expiration of the term of the existing license timely application is made for a new license*) during the term of such indictment and until any conviction pursuant to the indictment becomes final.

18 U.S.C. § 925(b) (emphasis added). The plaintiffs assert that the clear language of the exception merely required that Karl file a renewal application (which he did) without regard to whether the questions in the application were completed truthfully (which they were not). Mosley argues that, accorded a common sense construction, the statute can only be interpreted to permit an exception if a truthful application is filed.

■■■ It is a fundamental rule of construction that statutes must be construed to avoid absurd results if that is at all possible. *See e.g., Salomon Forex, Inc. v. Tauber,* 8 F.3d 966, 975 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994); *Brown v. Virginia Dept. of Corrections,* 886 F.Supp. 531, 535 (E.D.Va.1995). To this end, statutes applying to the same general conduct are to be read *in paria matria. United States v. Morison,* 844 F.2d 1057, 1064 (4th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 247 (1988).

■■■ Section 922(n) is a clear statutory command prohibiting all persons under indictment for crimes carrying more than a year's imprisonment from shipping or transporting firearms in interstate commerce. Thus, the reach of Section 922(n) is quite extensive. Its broad purpose is to proscribe commerce in guns by those facing serious criminal punishment and its reach is correspondingly broad in an effort to protect the public. Excepted from this expansive proscription are licensed firearms dealers, persons who earn their living in whole or in part from commerce in firearms, if they have timely applied for a renewal of their license.

In a related section of the statute, 18 U.S.C. § 926, the Secretary of the Treasury is authorized to "prescribe such rules and regulations as he deems reasonably neces-

sary to carry out the provisions of this chapter." In the exercise of this authority, the Secretary promulgated regulations which require an indicted firearms dealer to state in the renewal application that he is "under indictment for a crime punishable by imprisonment for a term exceeding one year." The regulation reads:

> Provided, That if the term of the license expires during the period between the date of the indictment and the date the conviction thereunder becomes final, such ... dealer ... must file a timely application for the renewal of his license in order to continue operations. *Such application shall show that the applicant is under indictment* for a crime punishable by imprisonment for a term exceeding 1 year.

27 C.F.R. § 178.143 (emphasis added).

Although Section 925(b) itself does not explicitly condition qualification for the exemption upon the filing of a truthful application, it is within the authority conferred on the Secretary by Section 926 to issue regulations prescribing the form and the content of the application which is required by Section 925(b).[9]  In addition, a logical common sense interpretation of the statute is that the dealer must somehow inform the licensing agency of the fact of the indictment and of the outcome of the proceedings. Otherwise, the licensing authority has no way of knowing that the narrow exception, rather than the broad rule, would apply. Moreover, it would produce an absurd result to construe the statute as authorizing untruthful applications.

■ For the foregoing reasons, the court concludes that Section 925(b), and the implementing regulations, cannot be interpreted to create in a licensed firearms dealer the right to operate under an existing license by filing a renewal application not in conformance with the Secretary's regulations which require, *inter alia*, disclosure of the fact of indictment. This, of course, means that the putative right allegedly violated by Mosley does not exist.

Ordinarily, that would end the qualified immunity analysis. Moreover, it is preferable to articulate a single basis for decisions and thus refrain from making alternative holdings. *Karsten v. Kaiser Found. Health Plan of the Mid-Atlantic States,* 36 F.3d 8, 11 (4th Cir.1994). However, because of observations made by the court in earlier, related proceedings, the parties have focused their arguments on the second and third prongs of the qualified immunity calculus: whether the claimed right was clearly established and whether a reasonable officer would have realized his actions would violate that right. Hence, it is best that the court consider the arguments on those points also.

■ As explained above, a reasonable reading of Section 925(b)'s language would permit law enforcement officers to conclude that a dealer must inform the Secretary of the fact of indictment in the application. Of course, as of May 1995, there was no reported judicial interpretation of Section 925(b) and hence, a reasonable reading of the statutory language would alone be sufficient to defeat the plaintiffs' assertion of the existence of a clearly established right to continue dealing in firearms after the submission of a false renewal application.

■ However, that was not the sole interpretive device available to a reasonably well-trained officer because the regulations were extant on May 5, 1994. As duly promulgated regulations, they are entitled to be considered by the law enforcement officer as imbued with the full force and effect of law. *Chrysler Corp. v. Brown,* 441 U.S. 281, 282, 99 S.Ct. 1705, 1707–08, 60 L.Ed.2d 208 (1979); *United States v. Mitchell,* 39 F.3d 465, 471 (4th Cir.1994).

Also, in 1994, the 1988–89 BATF agent's guide explained that an individual could receive a license "if the applicant ... has not willfully failed to disclose required material information or willfully made false statements in connection with his application." (Your Guide to) Federal Firearms Regulation 1988–89, June 1988, p. 83. This guide is appropriately considered in assessing wheth-

---

**9.** During the related criminal proceedings, the court expressed the view that the regulations appeared to be an impermissible expansion of the requirements of 18 U.S.C. § 925(b). Upon further reflection, it appears that view was in error.

er there existed a clearly defined right to secure the exemption of Section 925(b) by way of an untruthful renewal application.

■ Moreover, a reasonably well-trained law enforcement officer is entitled to rely on the views of an Assistant United States Attorney who sought an indictment charging Karl with illegal receipt of firearms while under indictment for a felony and to take into account the fact that Karl had been in fact indicted by a federal grand jury for violating Section 922(n). Finally, Mosley acted pursuant to a search warrant issued by a federal magistrate judge after a successful demonstration of probable cause to search Karl's Gun Shop.[10]

■ Considering the absence of judicial decisions interpreting Section 925(b), the language of the statute itself, the regulations implementing the statute, the BATF publication, the views of the Assistant United States Attorney assigned to the investigation, the fact of the grand jury indictment for a violation of Section 922(n), and the action of the magistrate judge, it simply cannot be said that the right on which the plaintiffs fasten their claim was clearly established, even if the statute accorded them the right on which they fasten their claims (which, as explained above, it does not). And, it certainly would not be known by a reasonably well-trained officer that applying for or executing a search warrant in this case violated a clearly established right.

Counts I, II and IV all depend upon the theory that Section 925(b) created a clearly applicable exception to Section 922(n) and therefore that the search (Count I), the seizure of weapons (Count II) and the seizure of documents (Count IV) were without probable cause. The findings that: (i) there is no exception under Section 925(b) absent a properly completed application; and (ii) even if there was, any right created by that exception was not so clearly established as of May 5, 1994 that a reasonable officer in Mosley's position would have known that his actions violated that right, thus put to an end the claims asserted against Mosley under Counts I, II and IV. Mosley will be granted summary judgment as to those counts.

### B. Blanton's Claims Of Qualified Immunity Under Counts I, II And IV

Blanton's Motion for Summary Judgment on Counts I, II and IV are controlled by the same rationale which supports the disposition of Mosley's motion on those counts.

### C. The Claims Against Mosley And Blanton: Counts III And V

Mosley and Blanton also seek summary judgment on Counts III and V.[11] In those counts, the plaintiffs allege that, notwithstanding the fact that the search warrant authorized only the seizure of firearms purchased *after* October 6, 1993 and documents relating to the receipt of firearms after that date, 6 of the 26 firearms seized were purchased before that date and several documents seized related to transactions occurring before that date.

#### 1. Firearms

During the search, it was confirmed from Karl's own records and from Mosley's personal knowledge that 12 of the 26 guns seized had been acquired after October 6, 1993, the date of the state indictment which was pend-

---

10. A magistrate's finding of probable cause receives "great deference," *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 591, 21 L.Ed.2d 637 (1969), and an officer executing a warrant issued by a magistrate is entitled to rely upon the validity of that warrant except in limited instances of obvious irregularity. These include, for example, (1) where the magistrate wholly abandoned his judicial role; (2) where the warrant is based upon an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; (3) where the warrant is facially deficient in failing to particularize the place to be searched or the objects to be seized; or (4) where an officer

submitted an affidavit that contained knowingly false statements and he should not have applied for the warrant. *United States v. Leon*, 468 U.S. 897, 923–24, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984); *Amato v. City of Richmond*, 875 F.Supp. at 1144–45. The Court finds that none of those exceptions are presented by this record.

11. While Blanton's actual Motion for Summary Judgment purports only to seek summary judgment on Counts III and V on the basis of qualified immunity, the Memorandum in Support of his motion addresses these counts on the merits.

ing when Karl filed the application for renewal of his license. Investigative efforts after the search revealed that 8 others were also acquired after that date. The plaintiffs assert that Mosley and Blanton improperly seized the remaining 6 guns because they lacked probable cause to believe that those unrecorded firearms had been acquired by Karl after October 6, 1993.

██ Probable cause in the seizure context means that "the facts available to the officer would 'warrant a man of reasonable caution in the belief,' [citation omitted] that certain items may be ... useful as evidence of a crime...." *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983). "A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Id.; see, also, United States v. Jones*, 31 F.3d 1304, 1313 (4th Cir. 1994). Of course, the seizure must be within the scope authorized by the warrant, but that does not preclude the need to assess what evidence is, and is not, within that scope where, as here, the scope is defined by a purchase date and the seized item bears no facial indication of the date of purchase.

Applying this standard to the circumstances presented on May 5, 1994, it must be remembered that Karl was required to maintain acquisition records and that, using those records, he had helped Mosley and Blanton locate documentation for each of the other guns, but was unable to do so for the 6 firearms in question. This rightly struck Mosley as unusual given Karl's cooperation during the search and his ability to track down the acquisition dates of other guns. Indeed, it strongly suggested that the records would not provide proof of acquisition at all.

██ Moreover, Mosley "had personal knowledge that 8 of the weapons [h]e located on the premises had been acquired by [Karl] as a firearms dealer subsequent to October 6, 1993, but that this information had not been recorded in his Acquisition & Disposition (A & D) books." Supplemental Declaration, at

3. In this context, Mosley had valid reasons to believe that the 6 unrecorded weapons were also received after October 6 and were not listed in the A & D records. This is not, as Karl asserts, a "guilt by association" theory for firearms seizures. Rather, it is merely one factor that contributed to Mosley's assessment that there was probable cause to seize the weapons. Assessing these factors together, "a man of reasonable caution" could have determined that these weapons were evidence of a crime, namely receipt of firearms while under indictment for a felony.

In addition, Mosley concluded that there existed independent grounds for the seizure of the weapons, notwithstanding the search warrant, because Karl willfully had failed to comply with the recordkeeping requirements imposed upon firearms dealers by 18 U.S.C. § 922(m). That section makes it unlawful for a licensed firearms dealer "to fail to make appropriate entry in or to fail to properly maintain, any record which he is required to keep pursuant to section § 923 ..." Failure to maintain such records subjects the weapons to seizure under 18 U.S.C. § 924(d)(1).

At the time of the search, Mosley knew the following facts indicating a willful recordkeeping violation: firearms licensees are provided information about the obligation to maintain A & D records; such information was found in Karl's possession; firearms dealers are instructed to keep proper records after recordkeeping violations are uncovered during inspections; Karl's Gun Shop had been the subject of two compliance inspections where violations were discovered;[12] and Karl had been advised on March 8, 1995 of his obligation to keep proper records. In addition, while firearms acquired outside a dealer's capacity as a licensee need not be recorded, Mosley asserts that the location of firearms in Karl's home did not "provide[ ] any clues as to whether they had been acquired by Karl as a licensee or for personal use." Supplemental Declaration, at 4. The absence of a means to identify the firearms as personal, which would have rendered the guns unseizable, left Mosley unable to rule

12. This is not probative of a pattern of lawbreaking, but rather of Karl's knowledge that failure to

keep records was illegal.

out the possibility that the guns were evidence of a crime, namely the willful failure of a dealer to record firearms.

Armed with such knowledge and finding no records respecting the guns in question, it was not unreasonable for Mosley to suspect willful recordkeeping violations in contravention of federal law. This provided an independent ground for seizure of the weapons. *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

■ Finally, the exigencies of a search permit law enforcement officers to seize articles, subject to later verification as to their status, when probable cause supports a belief that the items fall within the purview of a search warrant or are otherwise evidence of a crime. *See e.g., United States v. Fawole*, 785 F.2d 1141, 1144–46 (4th Cir.1986) (seizure of items found within a briefcase in order to make an inventory at agent's office and later returned was not violation of Fourth Amendment). Such a procedure is permitted in order to reduce the intrusiveness of the search and the time required to conduct it. *See, e.g., United States v. Schandl*, 947 F.2d 462, 465–66 (11th Cir. 1991).

### 2. Documents

In Count V, the plaintiffs contest the seizure of "documents relating to the purchase, receipt, ordering, or shipment of firearms prior to October 6, 1993." Originally, the plaintiffs conceded that Mosley was entitled to qualified immunity with respect to Count V because he had seized only documents relating to firearms acquired after October 6, 1993 as required by the warrant. Plaintiffs' Opposition to Motion of Defendant Mosley for Summary Judgment, at 12 n. 14.

However, the plaintiffs now challenge the seizure of certain additional items, which Mosley admitted to seizing in his deposition, specifically, a Report of Violations, copies of expired licenses, and three BATF-published firearms regulation books. However, none of these documents "relat[e] to the purchase, receipt, ordering and shipment of firearms prior to October 6, 1993," which are the only documents which are contested by Count V

of the Complaint. There has been no motion to amend the Complaint to contest the seizure of these items, and the record shows that they are not the subject of the Complaint as to which judgment is now sought.

■ Moreover, even if the plaintiffs were permitted to thus expand the Complaint, Mosley has raised independent justification for the seizure of each of the objectionable items: (1) the Report of Violations was evidence of knowing and willful disregard of recordkeeping obligations; (2) the search warrant specifically authorized the seizure of "Federal firearms licenses;" (3) one BATF publication, the "Green Book," was seized as evidence that Karl's false statement that he was not under indictment for a crime punishable by imprisonment for a term exceeding one year had been made "knowingly" in violation of 18 U.S.C. § 924(a)(1)(A); and (4) two copies of a second BATF publication were seized because Karl's possession of them constituted evidence both that his firearms license renewal application was knowingly false and that his recordkeeping violations were knowing and willful. Accordingly, the seizure of these documents was lawful.

Hence, Mosley and Blanton are entitled to summary judgment on Counts III and V on the merits.

### D. The Claim Against Blanton: Count VII

■ In Count VII, Karl alleges that Blanton violated his Fourth Amendment rights by directing a UPS employee to open a package addressed to Karl's Gun Shop without obtaining Karl's permission. Blanton maintains that he cannot be held liable for the behavior of a private citizen which he did not authorize. For purposes of deciding this issue, it will be assumed that Blanton was a state, rather than a federal employee. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege facts which show (1) a deprivation of a right, privilege, or immunity secured by the Constitution or federal law; and (2) that the deprivation was caused by a person while acting under color of state law. *Flagg Bros. Inc. v. Brooks*, 436 U.S. 149, 155–57, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d

185 (1978); *see also Davis v. Hudgins,* 896 F.Supp. 561, 569 (E.D.Va.1995).

 The right allegedly deprived was the right to be secure against unlawful searches. However, there must also be state action for a deprivation of an individual's constitutional rights to occur, and state action can be found only when it can be said that the state is responsible for the specific conduct about which the plaintiff complains. *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785–86, 73 L.Ed.2d 534 (1982). The state is accountable for a private decision only when it has exercised coercive power or has provided such significant encouragement that the choice, by law, must be deemed to be that of the state. The state's mere acquiescence in private action does not in itself, convert private action to that of the state. *Id.* at 1004–05, 102 S.Ct. at 2785–86.

According to Blanton's affidavit, he did not compel the opening of the UPS package by a private citizen. In fact, he states there were other options available to him if he wanted to discover the contents of the packages. In reality, the plaintiffs' charge rests only on the contrary, but conclusory, allegations of the pleadings. When those conclusory allegations are measured against the facts that: (i) the plaintiffs have no way of knowing what Blanton told UPS; (ii) they have produced no evidence from UPS, whose representative they could have deposed; and (iii) Blanton denies making an instruction to open the packages, the record will not support this claim. There being no genuine issue of material fact respecting Count VII, Blanton is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons set forth above, the Motion of Mosley for Summary Judgment on Counts I, II, and IV on the basis of qualified immunity and on the merits with respect to Counts III and V is granted. The Motion of Blanton for Summary Judgment on Counts I, II, and IV on the basis of qualified immunity and on the merits with respect to Counts III, V and VII is granted.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.