UNITED STATES of America, Appellee,

v.

Hank JENNINGS, Appellant.

No. 79–5254.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 6, 1981.
Decided June 22, 1981.

---

**2.** Daniels' testimony was uncontroverted, as the Hennings did not testify.

Leo I. Fox, Chicago, Ill., for appellant.

Sara Criscitelli, Washington, D. C. (Justin W. Williams, U. S. Atty., Nash W. Schott, Asst. U. S. Atty., Kevin R. Sullivan, Sp. Asst. U. S. Atty., Alexandria, Va., on brief), for appellee.

Before HAYNSWORTH, Senior Circuit Judge, PHILLIPS, Circuit Judge, and MICHAEL *, District Judge.

HAYNSWORTH, Senior Circuit Judge:

The question is whether a governmental agent was sufficiently involved in the search of a package in the possession of American Airlines in Chicago as to bring into play the prohibition of the Fourth Amendment and the exclusionary rule. After a suppression hearing, the district judge held that he was not, and we agree.

Immediately after picking up a package addressed to him at Washington National Airport in the Eastern District of Virginia, the defendant was arrested and later convicted of possession with the intent to distribute preludin, an amphetamine, in violation of 21 U.S.C. § 841(a)(1) and of unlawful use of a facility in interstate commerce with the intent to distribute preludin in violation of 18 U.S.C. § 1952(a)(3). The arrest and the subsequent conviction were dependent upon information obtained during an earlier search of the package in O'Hare Airport at Chicago.

At the trial, the defendant unsuccessfully sought to have excluded the pills, the package and the testimony regarding the Chicago search. On appeal, the question is whether the Chicago search was indeed in violation of his Fourth Amendment right.

I.

In early March 1979, agents of the Drug Enforcement Administration in Chicago received an anonymous tip that a Mary Jennings was sending illegal drugs from Chicago to her husband, the defendant, in Washington, D. C. On March 4, Whittington, one of those agents, passed on that anonymous tip to Herbert Briik, chief of security for American Airlines in Chicago, and to the Priority Parcel Service of American Airlines. An investigation by American Airlines disclosed that it had recently transported a package delivered to it in Chicago by Mary Jennings and delivered by it at the Washington National Airport to Hank Jennings.

On April 20, 1979, Briik was notified by the Priority Parcel Service of its receipt of a package from Mary Jennings for shipment to the defendant in Washington, D. C. Briik had the sealed package brought to his office. Its size and shape were that of a shoe box, and Briik was informed that the sender had declared the contents to be a pair of shoes. Briik's suspicions were aroused because he thought it highly unlikely that a sender would pay $29 to American Airlines for transportation of a pair of shoes to be picked up by the addressee at Washington National Airport or for delivery at a substantial additional charge to the addressee in the District of Columbia. What he observed was consistent with the earlier anonymous tip of which he had been informed.

* Honorable James H. Michael, Jr., District Judge for the Western District of Virginia, sitting by designation.

Briik decided to open the package. Before doing so, however, he telephoned Agent Whittington and invited him to be present when the package was opened. He did so, he said, because he wanted the presence of someone familiar with contraband drugs and capable of performing an immediate field test. Briik had been an FBI agent for twenty-years before he joined American Airlines as its security manager in Chicago, but he had not handled drug cases, and he did not have the means of performing field tests. Briik was also concerned about the obligation of American Airlines to send the package on the next flight to Washington National Airport if the contents of the package were not contraband. Speedy identification of the contents of the package was necessary.

Whittington, who had an office at O'Hare Airport, arrived at Briik's office approximately fifteen minutes after the telephone call. In his presence, Briik then opened the package, removed the top of the shoe box and discovered the contents were not shoes but pills. A field test was then performed by a governmental agent which indicated that the pills were preludin. The package was then resealed and sent by the next American Airlines flight to Washington National Airport, where it was picked up by the defendant.

## II.

It is clear that there was governmental involvement in the search to the extent that it was prompted by communication to Briik and the Priority Parcel Service of the anonymous tip the DEA agent received in March, and to the extent that the DEA agents actually participated in the search after they had been summoned by Briik on April 20. There is some slight uncertainty in the record about the extent of that participation, however. Whittington testified to his purely passive presence until after the package had been opened and its contents had been seen to have been pills. It is undisputed that a DEA agent performed the field test on one of the pills, which disclosed it to be contraband. Briik had

been very positive in his testimony that he alone decided to open the package, a decision he had made before he telephoned Whittington, but at one point in his testimony he responded "He did" when asked by the prosecutor whether any governmental agent had told him to open the package.

The district judge made no formal findings of fact after conclusion of the suppression hearing, but in an extensive colloquy with counsel, he repeatedly stated that Briik was acting on his own. Immediately after explicitly stating that Briik acted without any "suggestion or request from the government," the transcript indicates that he said "American Airlines admitted they opened it without the aid but a suggestion from the government." The sentence makes no sense unless "of" was mistranscribed as "but."

We cannot read that one inexplicable sentence as a finding that a DEA agent ordered, requested or suggested that the package be opened. To do so would be inconsistent with other clear and emphatic statements of the district judge. Indeed, Briik's reported answer to the question about governmental direction is substantially inconsistent with his statement that he alone decided to open the package and conduct the search. Moreover, that answer seems to have escaped the notice of everyone. The questioning of Briik moved immediately to other things and there was no later reference to it by any witness, by court or by counsel.

If there were any reasonable doubt about the findings of the district judge, the doubt should be resolved in favor of the United States, for the district judge denied the suppression motion. We held in *United States v. Bethea*, 598 F.2d 331 (4th Cir. 1979), that when, after a suppression hearing, a district judge is not requested to make findings of fact and makes none, we would adopt any reasonable view of the evidence, viewed in the light most favorable to the government, which would support the suppression denial. Considering all of the colloquy between court and counsel, however, we are left with no substantial

doubt that the district judge found that the search was not prompted by any suggestion from any governmental agent.

### III.

Everyone knows that the constraints of the Fourth Amendment apply only to the United States and its officers and agents and, through the Fourteenth Amendment, to the states and their officers and agents. The restraints apply to governments and not to private individuals. If a private person searches a package he may commit a civil wrong, for which he may be responsible in damages to the owner, but he has not violated the Constitution.

The exclusionary rule is fashioned to enforce and supplement constitutionally protected rights. It was never designed to rectify private wrongs. Hence, if the Chicago search was Briik's and not Whittington's, the evidence of it was properly admitted during the defendant's trial.

A governmental agent may not avoid constitutional restraints upon his conduct by procuring a private individual to perform a forbidden act for him. If Whittington had instigated the search and it had been done to serve the purpose of the Drug Enforcement Administration, it would have been in violation of the Fourth Amendment, but every incidental, passive involvement of governmental agents does not make conduct governmental. If, as the testimony and the findings at the suppression hearing show, the decision to search was Briik's alone, if the decision was made in the service of purposes of American Airlines and not as a surrogate for the DEA, if the search was conducted by Briik alone until the pills were removed from the box and the field test was administered upon one pill, the search was entirely beyond the reach of the Fourth Amendment. Neither the communication of the fact of the anonymous tip nor the passive presence of the DEA agents during the search nor the field testing of the pill, nor the three things in combination, suffices to make Briik's conduct that of the government.

Searches by common carriers of luggage and parcels tendered for shipment stand upon a different basis from most other private searches. A search of a suspicious package by an agent of an airline is not unlawful. Usually there is provision for it in the tariffs, but as was said in *United States v. Pryba*, 502 F.2d 391, 399 (D.C.Cir. 1974), the right of inspection

is rooted in the rule of common law that common carriers have the right to decline shipment of packages proffered in circumstances indicating contents of a suspicious, indeed of a possibly dangerous nature. Justification for the carrier's refusal is to be found in the exigencies of safeguarding life and property, and undeniably the frustration of criminality is likewise a worthy carrier endeavor. The imperatives of either objective may warrant inquiry by the carrier as to the contents of a parcel tendered for shipment; they may suffice, too, to justify a reasonable inspection of the parcel to fulfill that purpose. And the carrier's interest in ascertaining the character of suspicious parcels intensifies when, as here, the carrier conceivably could find itself faced with a criminal prosecution—albeit one perhaps ill-founded—for unlawfully transporting obscene matter.

Packages which arouse reasonable suspicions may contain evidence of crime, as this one did, but the purposes of the airlines are served by free communication of information between law enforcement agents and the agents of an airline whose duties involve the detection and elimination of dangerous or illegal cargo. If a law enforcement agency received information that a bomb was to be tendered for shipment by an airline, its duty would require that it promptly alert the appropriate employees of the airline. Performance of that governmental duty, however, would not convert any subsequent airline search into governmental action. The airline has its own strong duty to take all reasonable steps to detect and reject a live, packaged bomb. Its duty to detect and reject contraband tendered for shipment is somewhat less compelling, for the safety of the airline

passengers and employees is not implicated, but there is still a duty as well as a right of inspection of a package when it is reasonably suspected to contain contraband.

Thus it is held that the communication of such information as the anonymous tip to the agents of a public carrier does not make any subsequent search conducted by the carrier a search by the agency which initiated the communication.[1]

Briik's decision to open the package was not based alone upon the anonymous tip reported to him by Whittington. His suspicions were greatly enhanced by the information that the sender had paid $29 to send to her husband a package which she declared to contain only a pair of shoes. He testified that he made the decision to open the package before he telephoned Whittington, and there is no infirmity in the district court's finding that the decision to search was Briik's and not Whittington's.

Nor were Whittington's passive presence during the search[2] and the administration of the field test upon one of the pills[3] such involvement as to make Briik's search public rather than private.

In dealing with suspicious packages, a security agent of an airline frequently may wish the presence of a law enforcement official expert in dealing with the kind of materials suspected to be present. If he suspected a bomb, he surely would want the presence of a law enforcement official expert in disarming live bombs. If there were no need for promptness, he might feel no great need for the presence of an expert in the identification of illegal drugs, if their presence was suspected, though it would have been his duty promptly to turn over the drugs to the law enforcement agents as soon as they were identified. He might

reasonably have wished Whittington's presence in order to discharge that duty without delay. In this case, however, Briik had strong reason for haste. The airline had a commitment to ship the package to Washington National Airport on American's next flight. Consistent with that commitment, he could not open the package and, after discovery of the pills, hold it while one of the pills was sent for testing hours or days later. He testified that he wanted an immediate field test to be performed if the package were found to contain suspicious drugs. He would not have needed Whittington if the package had been found to contain shoes, but when found to have contained pills, as Briik had suspected, he needed an immediate field test in order to meet the airline's commitment in the event that the testing showed the material to be innocent. Whittington's presence in the administration of the field test served the purpose of the airline.

Of course, Briik knew that if the package was found to contain illegal drugs, subsequent disposition of the parcel would be at the direction of DEA agents. In that event, service of the purposes of the airline also served the purposes of the law enforcement agency. That is a matter of no consequence, however. As observed in *Coolidge v. New Hampshire*, 403 U.S. 443, 488, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971), "it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals."

Briik opened the defendant's package on his own initiative and for his own purposes. The government's involvement before, during and after the search was insufficient to

---

1. *See United States v. Cangiano*, 464 F.2d 320, 323–25 (2d Cir. 1972), vacated on other grounds, 413 U.S. 913, 93 S.Ct. 3047, 37 L.Ed.2d 1023 (1973); *Gold v. United States*, 378 F.2d 588, 590–91 (9th Cir. 1967).

2. *See United States v. Walther*, 652 F.2d 788 (9th Cir. 1981); *United States v. Gomez*, 614 F.2d 643 (9th Cir. 1979); *United States v. DeLa Fuente*, 548 F.2d 528, 540 (5th Cir. 1977); *United States v. Lamar*, 545 F.2d 488 (5th Cir.

1977); *United States v. Entringer*, 532 F.2d 634, 637 (8th Cir. 1976).

3. *See United States v. Andrews*, 618 F.2d 646 (10th Cir. 1980); *United States v. Edwards*, 602 F.2d 458 (1st Cir. 1979); *United States v. Rodriguez*, 596 F.2d 169, 175 (6th Cir. 1979); *United States v. Crabtree*, 545 F.2d 884 (4th Cir. 1976); *United States v. Ford*, 525 F.2d 1308, 1311–12 (10th Cir. 1975).

convert the private search into a governmental search. There being no Fourth Amendment violation, the motion to suppress the evidence uncovered by that search was properly denied.

*AFFIRMED.*