UNITED STATES of America,

v.

Karl V. DAVID.

Criminal No. 3:94cr39.

United States District Court,
E.D. Virginia,
Richmond Division.

Oct. 25, 1996.

**1406**

George Metcalf, Office of the United States Attorney, Richmond, VA, for Plaintiff.

Michael Morchower, Lee W. Kilduff, Morchower, Luxton & Whaley, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

Karl V. David has been charged, *inter alia*, with the unlawful receipt of four firearms in violation of 18 U.S.C. § 922(n).[1] David has moved to suppress the admission of firearms which were seized during a search of his home and office conducted on May 5, 1994, pursuant to a search warrant issued on May 4, 1994. David argues that the search warrant was procured by virtue of information obtained in an unlawful search which preceded issuance of the warrant. Specifically, David contends that a package sent to him from Bob's Gun Shop in Norfolk, Virginia via United Parcel Service ("UPS") was illegally opened and that this allegedly illegal search was conducted by UPS employees acting as agents of the government, particularly the Bureau of Alcohol, Tobacco, and Firearms. David claims that the illegal discovery of a firearm in the package opened by UPS was used as a basis for establishing probable cause to obtain the search warrant under which the firearms at issue were seized.

David's motion to suppress is denied for the following reasons. First, David has failed to carry his burden to prove that the opening of the package was governmental. Second, assuming, *arguendo*, that the opening was governmental and thus unconstitutional, the subsequent investigation of David, including a controlled delivery and the securing of the search warrant, was not prompted by, and was wholly unconnected to, the discovery of the firearm in the allegedly unlawful search. Consequently, based upon those portions of the search warrant affidavit unrelated to the illegal discovery, the affidavit provided sufficient probable cause to support the issuance of the search warrant. Finally, the seizure of the challenged firearms was not tainted by the alleged antecedent illegal search because the seizure was based on information from an independent source and would otherwise have been inevitably discovered by lawful means.

## STATEMENT OF FACTS

David owns Karl's Gun Shop, a federally licensed firearms dealership in Milford, Virginia. On April 19 1994, Kenneth G. Mosely, Jr., Special Agent, Bureau of Alcohol, Tobacco and Firearms, ("ATF"), learned that on October 6, 1993, David had been indicted by a state court grand jury and charged with a felony, punishable by up to twenty years imprisonment.[2] At the same time, Mosely learned that David had been arraigned on October 27, 1993 and informed of the indictment against him. (Mosely Aff. at 1–2). Also on April 19, Mosely discovered that on March 23, 1994, David had submitted to ATF an ATF Form 8, ("Renewal of Firearms License") in an effort to secure renewal of his

---

1. "It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(n).

2. At the suppression hearing, testimony revealed that Mosely first became aware of these facts from Virginia State Police Special Agent Taylor V. Blanton who had seen it reported in a newspaper article. Blanton also told Mosely that David's name was on a list of firearms' dealers who would be attending a gun show.

Federal Firearms License number which was due to expire on April 1, 1994. *Id.* at 2–3.

Mosely then obtained a copy of the ATF Form 8, which was dated March 23, 1994, five months after David's indictment. The form signed by David contained the statement that David was not presently under indictment for a crime punishable by more than a year. *Id.* at 3. Based upon this knowledge, Mosely secured permission from his ATF superiors to investigate David for possible violations of federal firearms statutes.

Some time between April 19 and either April 21 or 22, Virginia State Police Special Agent Taylor V. Blanton, who was then on special assignment to ATF, communicated with Robert Martinson, an employee of the loss prevention department of UPS in Richmond. (Blanton Deposition at 36; Mosely Aff. at 4; testimony). Blanton told Martinson that Mosely "had a federal investigation involving a federal firearms dealer that involved receiving firearms after being under indictment for a felony, and that I [Blanton] was told that was a federal violation and we needed to monitor to see, if any, what kind of shipments he got." (Blanton Dep. at 37). Martinson agreed to inform Blanton if UPS received any packages for the address. *Id.* at 37. At the suppression hearing, there was conflicting evidence respecting whether Blanton asked Martinson to hold packages or to simply notify him about the shipments.

On April 21 or 22, 1994,[3] Martinson telephoned Blanton and reported that the UPS office in Fredericksburg had received two packages addressed to Karl's Gun Shop. (Blanton Dep. at 37–38; Mosely Aff. at 3). Here the testimony conflicts. According to Blanton, Martinson set up a conference call among Blanton, Kenneth Tickle, Manager of the UPS Fredericksburg branch, and Martinson. (Blanton Dep. at 38). According to Martinson and Tickle, however, there was no conference call. Instead, under their recollection, Martinson made one call to Tickle

and another to Blanton on different telephones located in the same room about ten feet apart from each other. Martinson relayed information back and forth between the two parties. However, it is uncontested that, during the call, Tickle stated that UPS was in possession of two packages destined for Karl's Gun Shop: one from Bob's Gun Shop in Norfolk and one from T.S. Goldenberg in North Carolina. (Blanton Dep. at 38). There also is dispute, however, about the ensuing events. According to Blanton and Tickle, Martinson asked Tickle if any of the packages could be opened to which Tickle replied that he could open the package from Bob's but not the other one. According to Blanton and Tickle, Martinson told Tickle to open the package, asking what it contained. Martinson denies asking Tickle to open the package, claiming instead that he only asked Tickle whether he could determine what the packages contained, meaning that Tickle should look at the labels or invoices.

The record thereafter is not disputed. Either on Martinson's request or on his own initiative, Tickle opened the package from Bob's Gun Shop and reported that the package contained a .38 caliber revolver and provided the serial number. Under either scenario, Blanton was privy to exchanges between Martinson and Tickle, whatever they were, and Blanton learned then that the package from Bob's Gun Shop contained a firearm. Blanton and Martinson testified that Blanton never asked UPS to open the package.[4] Tickle did not suggest otherwise.

After Blanton's conversation with Martinson, he made arrangements to travel to Fredericksburg the next day with equipment and a technician for the purpose of x-raying both packages. Although UPS agreed to hold the packages for that purpose, when Blanton arrived, he was informed that the packages had been delivered to David. (Blanton Dep. at 39–40).

On April 26, 1994 at 9:00 a.m., Martinson informed Blanton that UPS possessed two

---

**3.** Blanton's deposition recites the date as *April 22,* 1994. Mosely's affidavit uses the date of *April 21,* 1994.

**4.** Blanton's only participation in the conversation was to ask where the packages came from (before the package was opened) and to ask what the serial number on the gun was (after the package was opened).

new packages bound for Karl's Gun Shop, one from SOG, International ("Southern Ohio Gun") and the other from Brownell's, Inc. in Iowa. (Mosely Aff. at 4). When contacted by the agents, Southern Ohio Gun reported that the package bound for Karl's Gun Shop contained one Russian, Makarov, model PM, 9 × 18 caliber pistol, serial number 0080. Brownell's Inc. reported that the package it had shipped contained gunsmithing supplies and equipment.

Mosely was given permission by his ATF supervisor and the United States Attorney to make a controlled delivery of the packages to David. (Blanton Dep. at 42). On April 26, 1994, at about 11:30 a.m., Mosely met with Joseph V. Lang, UPS District Loss Prevention Manager. Lang agreed to let Mosely pose as a UPS delivery person and deliver the packages from Southern Ohio Gun and Brownell's, Inc. to Karl's Gun Shop. At approximately 2:40 p.m. on April 26, Mosely and Martinson arrived at Karl's Gun Shop where they were greeted by an unknown male. Another male, approximately forty to forty-five years of age asked how much the total cash delivery amount was required on the two packages and returned with the money in hand. Mosely placed the packages within six inches of the door, accepted the money, and asked the recipient for a signature to confirm receipt. The individual signed "K.V. David" and upon request, verbally confirmed his signature.

On May 2, 1994, Mosely learned from Southern Ohio Gun's bookkeeper that the following firearms were ordered by Karl's Gun Shop and shipped by UPS on the following dates: an M–1 Garand ordered 11/1/93 and shipped 11/2/93; an M–1 Carbine ordered 11/5/93 and shipped 11/5/93; an Enfield # 1, MK 3, ordered 11/8/93 and shipped 11/15/93; a Star, Firestar, ordered 1/19/94 and shipped 1/25/94; a Russian SKS ordered 2/17/94 and shipped 2/23/94; a Russian SKS, Paratrooper, ordered 2/25/94 and shipped 2/28/94; a Russian SKS ordered 2/25/94 and shipped 2/28/94; a Russian SKS ordered 3/18/94 and shipped 3/18/94; and a Russian Makarov, ordered 4/20/94 and shipped 4/22/94. (Mosely Aff. at 7–8).

On the basis of the foregoing information, Mosely applied for, and received, a warrant to search Karl's Gun Shop and to seize certain weapons. The weapons seized during that search are the subject of David's motion to suppress.

## DAVID HAS FAILED TO PROVE THAT OPENING THE PACKAGE FROM BOB'S GUN SHOP CONSTITUTED A GOVERNMENTAL SEARCH

### A. Rule of Law

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ..." Const.Amend. IV. "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984) (citations omitted). "Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable." *Id.* at 114, 104 S.Ct. at 1657 (citations omitted).

The Fourth Amendment, however, proscribes only governmental action; and indeed the amendment "is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" *Jacobsen*, 466 U.S. at 113–14, 104 S.Ct. at 1656 (quoting *Walter v. United States*, 447 U.S. 649, 662, 100 S.Ct. 2395, 2404, 65 L.Ed.2d 410 (1980) (BLACKMUN, J., dissenting)); *see also, United States v. Kinney*, 953 F.2d 863, 865 (4th Cir.), cert. denied, 504 U.S. 989, 112 S.Ct. 2976, 119 L.Ed.2d 595 (1992) ("The Fourth Amendment is directed exclusively at state action and evidence secured by private searches, even if illegal, need not be excluded from a criminal trial.") (citing *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921); *United States v. Mehra*, 824 F.2d 297, 299 (4th Cir.), cert. denied, 484 U.S. 915, 108 S.Ct. 263, 98 L.Ed.2d 220 (1987)).

■ The burden of proving that a private search is governmental action lies on the movant: in this case, David. *See United States v. Feffer*, 831 F.2d 734, 739 (7th Cir. 1987) ("it is the movant's burden to establish by a preponderance of the evidence that the private party acted as a government instrument or agent."); *United States v. Reed*, 15 F.3d 928, 931 (9th Cir.1994) ("The defendant has the burden of showing government action.") (citing *United States v. Gumerlock*, 590 F.2d 794 (9th Cir.) *(en banc)*, *cert. denied*, 441 U.S. 948, 99 S.Ct. 2173, 60 L.Ed.2d 1052 (1979)).

### B. Knowledge and Acquiescence By The Government Constitutes Insufficient Evidence To Attribute a Private Search to the Government

■ David asserts that the alleged illegal search of the package from Bob's Gun Shop was conducted with the government's knowledge and acquiescence and therefore violated the Fourth Amendment. He points to the following facts in support of his argument: (1) Blanton initiated contact with the UPS, informing Martinson, a UPS employee, of the on-going investigation and the need to monitor shipments; (2) Blanton participated in the call during which Martinson told Tickle, another UPS employee, to open the package from Bob's Gun Shop; and (3) Blanton was on the telephone when the package was opened by Tickle. For the following reasons, the Court finds that the government's knowledge of, and acquiescence in, the UPS search does not constitute governmental action for purposes of the Fourth Amendment.

In *Jacobsen*, the Supreme Court observed that the Fourth Amendment "is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government *or with the participation or knowledge of any governmental official.*'" *Jacobsen*, 466 U.S. at 113, 104 S.Ct. at 1656 (quoting *Walter v. United States*, 447 U.S. 649, 662, 100 S.Ct. 2395, 2404, 65 L.Ed.2d 410 (1980) (BLACKMUN, J., dissenting)) (emphasis added). Based upon the underscored language, David asserts, and an argument could be made that, there are two ways in which a search or

seizure by a private person could be attributed to the government: (1) when the private citizen acts as an agent of the government; or (2) when the government official has knowledge of, and participates in, the private actor's conduct. However, the parties did not bring to the court's attention (nor did the court find in its own research), any decision actually holding that governmental action can be found solely upon the second prong of *Jacobsen*, knowledge and participation of the government.

In contrast, "in order for a private search to be considered action by the government," the Courts of Appeals have focused on whether a private actor may " 'be regarded as having acted as an 'instrument' or agent of the state.'" *See Kinney*, 953 F.2d at 865 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971)). Most circuits focus on two critical factors in approaching this question. *See e.g., United States v. Cleaveland*, 38 F.3d 1092, 1093 (9th Cir.1994) ("In determining whether a private party's search implicates the Fourth Amendment, the relevant inquiry is: '1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends.'") (citing *United States v. Reed*, 15 F.3d 928, 931 (9th Cir.1994)) (quoting *United States v. Miller*, 688 F.2d 652, 657 (9th Cir.1982)); *United States v. Feffer*, 831 F.2d 734, 739 (7th Cir.1987) ("Our review of the foregoing cases makes clear that ... two critical factors in the "instrument or agent" analysis are whether the government knew of and acquiesced in the intrusive conduct and whether the private party's purpose for conducting the search was to assist law enforcement efforts or to further her own ends."); *United States v. Parker*, 32 F.3d 395, 398–99 (8th Cir.1994) ("Two critical factors in assessing whether a private party acts as an agent of the government are (1) the government's knowledge and acquiescence in the search, and (2) the intent of the party performing the search.") (citations omitted). These decisions make the relevant inquiry an agency analysis.

The Fourth Circuit similarly has held that "[f]or purposes of the exclusionary rule, a private actor must 'be regarded as having acted as an 'instrument' or agent of the state,' in order for a private search to be considered action by the government. * * * [M]ore than the mere presence of a police officer is necessary to constitute the government action required to implicate Fourth Amendment concerns." *Kinney*, 953 F.2d at 865 (quoting *Coolidge v. New Hampshire*, 403 U.S. at 487, 91 S.Ct. at 2049). Furthermore, according to the Fourth Circuit, in determining whether an agency relationship exists, the question is:

> one of fact, based on the particular circumstances, but the factual inquiry is one *guided by common law agency principles.* *United States v. Koenig*, 856 F.2d 843, 847 n. 1 (7th Cir.1988). Of critical importance, for an agency relationship between a private citizen and the government to exist, both parties must have manifested their consent to that relationship, either expressly or by necessary implication from their conduct. *Id.* Highly relevant to that issue is 'whether the government knew of and acquiesced in the intrusive conduct' and whether the private party's purpose for conducting the search was to assist law enforcement agents or to further his own ends. *Feffer*, 831 F.2d at 739; *see also United States v. Walther*, 652 F.2d 788, 792 (9th Cir.1981). While within these principles, Government knowledge of the private person's conduct obviously is critical, it is not enough, standing alone to establish the requisite agency. *See United States v. Kinney*, 953 F.2d 863, 865 (4th Cir.1992). And, relatedly, the failure of government actors to prevent a private person from conducting a search that they could not themselves conduct lawfully, does not, standing alone, make the private person's conduct that of the Government. *See* W.R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 1.8(b) at 181 (2d ed. 1987).

*United States v. Moss*, 1996 WL 389484 (4th Cir. July 12, 1996) (unpublished).

The record here permits the inference that Blanton "knew of and acquiesced" in Tickle's search. The court finds, however, that knowledge and acquiescence by the government does not convert a private search into a governmental one for purposes of the Fourth Amendment. For the following reasons, the court also finds that under the test prescribed by the Fourth Circuit, David has failed to prove that UPS acted as an agent of the government.

## C. David Failed to Prove the Existence of an Agency Relationship

Although unpublished opinions are not binding precedent, the Court finds that the test set forth in *Moss* is helpful in determining whether UPS was acting as an agent for the government in opening the package from Bob's Gun Shop. Under the fact-based approach suggested by *Moss* and the authority on which it relies, the inquiry is to be guided by the common law rules of agency.

The facts here do not support a finding of an agency relationship. Blanton's presence on the telephone when the package was opened would not, by itself, be enough to find government action. *Kinney*, 953 F.2d at 865 ("more than the mere presence of a police officer is necessary to constitute the government action required to implicate Fourth amendment concerns."). Blanton's knowledge that Tickle opened the package would also be insufficient, standing alone, to establish an agency relationship. *Moss*, 1996 WL 389484 at **3 ("While ... Government knowledge of the private person's conduct obviously is critical, it is not enough, standing alone to establish the requisite agency.") Finally, Blanton's failure to prevent Tickle from opening the package would also, in and of itself, be inadequate to constitute governmental action. *Id.* ("... the failure of government actors to prevent a private person from conducting a search that they could not themselves conduct lawfully, does not, standing alone, make the private person's conduct that of the Government.").

These facts, individually or in combination, do not suffice to establish an agency relationship, provided that UPS acted on its own initiative and in furtherance of its own purpose. This conclusion remains unchanged even though the government agents here

initiated contact with UPS, informing UPS employees of the ongoing investigation and the need to monitor shipments. Indeed, under similar facts, where an airline official searched a package in the presence of the DEA, after a DEA agent had conveyed a tip to the airline about possible drug trafficking, the Fourth Circuit held:

> if ... the decision to search was [the private actor's] alone, *if the decision was made in the service of purposes of American Airlines and not as a surrogate for the DEA,* if the search was conducted by [the private actor] alone until the pills were removed from the box and the field test was administered upon one pill, *the search was entirely beyond the reach of the Fourth Amendment.* Neither the communication of the fact of the anonymous tip nor the presence of the DEA agents during the search nor the field testing of the pill, nor the three things in combination, suffices to make [the private actor's] conduct that of the government.

*United States v. Jennings,* 653 F.2d 107, 110 (4th Cir.1981) (emphasis added).

Applying the principles enunciated in *Jennings* in light of the common law of agency, if UPS was acting to further its own purpose, a necessary element of an agency relationship has not been proven, namely that the agent has acted to benefit the principal. Thus, it is necessary to decide whether the purpose of UPS in opening the package was to assist law enforcement or to further its own ends. *Moss* at \*\*3 (citing *Feffer,* 831 F.2d at 739).

### i. The UPS' Purpose in Opening the Package

■ The Fourth Circuit has recognized that "[s]earches by common carriers of luggage and parcels tendered for shipment stand upon a different basis from most other private searches. A search of a suspicious package by an agent of an airline is not unlawful. Usually there is provision for it in

the tariffs ..." *Jennings,* 653 F.2d at 110. In any event, under the common law:

> common carriers have the right to decline shipment of packages proffered in circumstances indicating contents of a suspicious, indeed of a possibly dangerous nature. Justification for the carrier's refusal is to be found in the exigencies of safeguarding life and property, and undeniably the *frustration of criminality is likewise a worthy carrier endeavor.* The *imperatives of either objective may warrant inquiry by the carrier as to the contents of a parcel tendered for shipment;* they may suffice, too, to justify *a reasonable inspection* of the parcel *to fulfill that purpose.* And the carrier's interest in ascertaining the character of suspicious parcels intensifies when, as here, the carrier conceivably could find itself faced with a criminal prosecution albeit one perhaps ill-founded for unlawfully transporting obscene matter.

*Jennings,* 653 F.2d at 110 (quoting *United States v. Pryba,* 502 F.2d 391, 399 (D.C.Cir. 1974)).

■ As a common carrier, UPS was entitled to inspect the package from Bob's Gun Shop pursuant to its tariff and also under the common law. It cannot be summarily concluded merely from the existence of such authority, however, that the search in this case was private. A per se rule of that sort could lead to the type of abuse against which the "instrument or agency" rule was intended to protect.[5] *See Jennings,* 653 F.2d at 110 ("A governmental agent may not avoid constitutional restraints upon his conduct by procuring a private individual to perform a forbidden act for him.").[6] For this reason, rather than simply accepting an asserted justification for a private search, courts have examined the facts and circumstances to determine whether the private actor actually conducted the search or seizure to further its own purpose. *See United States v. Reed,* 15 F.3d 928, 931 (9th Cir.1994) (rejecting government's argument that a hotel manager

---

5. Under such a rule, for instance, law enforcement officials could ask UPS to open every package sent to a potential suspect until evidence of a crime was uncovered or to ask hotel managers to open every room in a hotel to see if a suspect was present.

6. *C.f. United States v. Jenkins,* 46 F.3d 447, 460 (5th Cir.1995) ("becoming an 'agent' for purposes of Fourth Amendment analysis does not terminate one's right to engage in conduct which was authorized prior to entering the agency relationship.")

entered a room to ensure against property damage because the manager conducted a search—while the police served as lookouts—beyond that necessary to assure the absence of property damage and in part for the stated purpose of helping police gather proof).

One relevant fact is whether the private actor would have conducted the search had the government not been involved. *See Feffer,* 831 F.2d at 739 (upholding finding that IRS informant's motivation in seizing documents was independent of governmental involvement because testimony suggested that cooperation was due to fear of complicity in tax fraud and desire to retaliate against employer for firing boyfriend). Another factor is whether the search exceeded the scope of the private actor's authority. *United States v. Cleaveland,* 38 F.3d 1092, 1094 (9th Cir. 1995) (finding that where electric company received tip of unlawful activity, and where company initiated plan to inspect meter, and did not exceed authority in inspection, the independent and legitimate motive to recover money for company was not overridden by dual motive or by government's not-so-extensive participation as "lookout" during inspection).

In this case, there is no evidence that UPS exceeded the scope of its common carrier authority in conducting the search. On the other hand, Tickle testified that he would not have opened the package had Martinson not directed him to do so. This fact, combined with Tickle's knowledge that Blanton was present on the telephone with Martinson, leads David to the conclusion that Tickle was motivated only by his desire to aid law enforcement and that had the government not been involved, the package would not have been opened.

That simplistic analysis belies the complexity of this case. Here UPS had a duty to deliver the package to David if it did not contain contraband. It also had a conflicting duty to refrain from delivering the package if it contained contraband. *See Illinois v. Andreas,* 463 U.S. 765, 769 n. 1, 103 S.Ct. 3319,

3323 n. 1, 77 L.Ed.2d 1003 (1983). ("Common carriers have a common law right to inspect packages they accept for shipment, based on their duty to refrain from carrying contraband.") *See also Jennings,* 653 F.2d at 110–11. (Noting that although airlines' duty to reject contraband is less compelling when there is no suspicion that a bomb is enclosed, "there is still a duty as well as a right of inspection of a package when it is reasonably suspected to contain contraband.") [7]

Having been alerted that David was under investigation for the alleged receipt of firearms, and having in its possession a package addressed to David from a gun shop, UPS could have been expected to open the package pursuant to its duty to refrain from delivering contraband. *See Illinois v. Andreas,* 463 U.S. at 769 n. 2, 103 S.Ct. at 3323 n. 2 ("When common carriers discover contraband in packages entrusted to their care, it is routine for them to notify the appropriate authorities. The arrival of police on the scene to confirm the presence of contraband and to determine what to do with it does not convert the private search by the carrier into a government search subject to the Fourth Amendment.") (citing *United States v. Edwards,* 602 F.2d 458 (1st Cir.1979)). In other words, it was lawful for UPS to have opened the package to determine whether it contained firearms which UPS then knew David was not entitled lawfully to receive. Then UPS could have informed the government of the results of the private search. The presence of Blanton by telephone while UPS acted should not convert an otherwise lawful search into an unlawful one. Indeed, Blanton's presence during the search would actually serve the purpose of the UPS because it would expedite the decision as to whether or not the delivery should be made.

For example, in *Jennings,* 653 F.2d at 111, the Fourth Circuit found that because an airline had a commitment to ship a package on the next flight and wanted an immediate field test to be performed if the package contained illegal drugs, the DEA agent's

---

7. "Packages which arouse reasonable suspicions may contain evidence of crime, ... but the purposes of the airlines are served by free communication of information between law enforcement

agents and the agents of an airline whose duties involve the detection and elimination of dangerous or illegal cargo." *Id.*

presence in the administration of the field test served the purpose of the airline. The Court of Appeals further noted that, even though the disposition of the package would be at the direction of the DEA if it contained drugs,

> in that event service of the purposes of the airline also served the purposes of the law enforcement agency. That is a matter of no consequence, however. As observed in *Coolidge v. New Hampshire,* 403 U.S. 443, 448, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971) 'it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals.'

*Jennings,* 653 F.2d at 111; *see also Cleaveland,* 38 F.3d at 1094 (dual motive to recover money and assist police permissible where government's participation in private search not so extensive); *but see Reed,* 15 F.3d at 932 (" 'snooping' is not a legitimate motive and finding evidence of criminal activity is not independent").

It would thus be logical to conclude that UPS acted to further both its and the government's interest. Unfortunately, the record neither supports nor refutes a finding that UPS operated with such a dual motive. The burden rests upon David to establish that the private search was in fact governmental action and the failure to elicit evidence on motive also logically should fall on David.

■ However, it is unnecessary to decide the matter on the burden of proof issue. Although the purpose of the private actor in conducting the search is an important factor, it is not dispositive on the question of whether a private actor should be considered an agent of the government. Rather, the court must examine all the relevant facts and circumstances, guided by the common law of agency. *Moss, supra; see also Coolidge,* 403 U.S. at 487, 91 S.Ct. at 2049 ("the test is whether "in light of all the circumstances of the case" the private actor "must be regarded as having acted as an 'instrument' or 'agent' of the state.") In this case, given the totality of the facts, the Court finds that David has not proved that the UPS employees were acting as governmental agents in conducting the search.

Here, the government informed UPS of the investigation, not with the intent to circumvent the Fourth Amendment, but because they knew UPS could monitor shipments to David. Monitoring shipments is a standard law enforcement practice not a police tactic to procure a search that could not otherwise be performed. This holds especially true in the present case where the police could lawfully discover the packages' contents by x-ray. Moreover, Blanton never requested, suggested or indirectly encouraged UPS to open any of David's packages. Nor did he supervise the opening of the package from Bob's Gun Shop. Indeed, the factual record establishes clearly that the package was lawfully opened pursuant to UPS' right to inspect at the behest or initiative of a UPS employee, not at the instance of Blanton.[8]

Moreover, even if Tickle mistakenly believed that Blanton wished him to open the package, the exclusionary rule should have no application because it is designed to protect against government wrongdoing.[9] Here there was no governmental misconduct. Blanton's presence was purely passive.[10] Neither did Blanton commit constitutional error in failing to stop Martinson and Tickle from their unprocured, unplanned assistance.

---

**8.** In this regard, it is irrelevant whether Martinson asked Tickle to open the package, as Tickle claims, or whether Tickle opened the package because he misunderstood Martinson's direction. In either case, the initiative was that of the private actor.

**9.** Even if it could be said that Blanton harbored a concealed hope that UPS would open the package, if Blanton did not act on such intentions, such as by encouraging the UPS, his motive would not appear to be relevant to the assessment of the legality of the search. *See Whren v. United States,* —— U.S. ——, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (the constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved).

**10.** Blanton testified that he believed that the UPS opened the package for some purpose unrelated to his investigation and that he was included on the call as a courtesy.

*See Coolidge*, 403 U.S. at 489, 91 S.Ct. at 2049 (noting that when spouse of suspect of "her own accord produced the guns and clothes for inspection, rather than simply describing them, it was not incumbent on the police to stop her or avert their eyes."); *United States v. Cleaveland*, 38 F.3d 1092, 1094 (9th Cir.1995) (holding that where electric company received tip about power diversion and marijuana growing, initiated plan to inspect meter pursuant to contract and asked for police presence, "[t]here was 'no reason' why the [detective] should have restrained ... or discouraged [the inspector] in his search") (citation omitted); *c.f. Reed*, 15 F.3d at 931 (in finding governmental action, noting officers' failure to discourage hotel manager from examining guests' personal belongings beyond that necessary to secure hotel property).

Finally, this case is quite unlike the circumstances which prompted a finding of agency in *United States v. Reed*, 15 F.3d 928 (9th Cir.1994). In *Reed*, the private party exceeded the scope of his authority and went far beyond what was necessary for his purpose. Here, the UPS employees acted within the authority conferred by the common law and its tariffs. Moreover, in *Reed* the officers acted as lookouts during the search which the court considered to be a significant role. Here, however, Blanton's participation in the challenged search was incidental and insignificant.

This case does not suggest abuse of the governmental power directly or indirectly through UPS. The evidence supports a finding that UPS acted wholly on its own initiative and pursuant to its lawful authority. The court thus finds that, under the facts of this case, the UPS employees were not acting as 'instruments' or 'agents' of the state.

## THE FIREARMS SHOULD NOT BE SUPPRESSED AS FRUIT OF THE POISONOUS TREE

If, however, it is assumed that the opening of the package from Bob's Gun Shop offended the Fourth Amendment, it becomes necessary to address David's contention that the opening tainted the seizure of the challenged firearms in two ways: first, because the firearm found in the package was recited in the affidavit in support of the search warrant, the warrant was improperly issued; and second, the firearm affected the continued investigation of David because the controlled delivery would not have occurred had the firearm not been discovered in the unlawful search.

### A. Rule of Law

"In analyzing a motion to suppress evidence gained in violation of the fourth amendment, a court must first identify the character of the alleged violation and the evidence that was obtained as a result of that violation." *United States v. Clark*, 891 F.2d 501, 505 (4th Cir.1989). The "exclusionary rule" ... prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.' *Murray v. United States*, 487 U.S. 533, 536–37, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 (1988) (quoting in part, *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). *See Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963)).

The exclusionary rule does not apply to all evidence that is the product of an unconstitutional search or seizure no matter how indirectly related. "Even when a fourth amendment violation has concededly occurred, evidence challenged on a suppression motion will not be excluded unless a causal relationship exists between that particular violation and the discovery of the evidence sought to be excluded." *Clark*, 891 F.2d at 505. To constitute fruit of the poisonous tree, more than a "but for" relationship must exist between the challenged evidence and the unconstitutional conduct. As explained by the Supreme Court in *Wong Sun*:

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether granting establishment of the primary

illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

*Wong Sun v. United States,* 371 U.S. at 487–88, 83 S.Ct. at 417 (quoting J. Maguire Evidence of Guilt 221 (1959)).

▮ The exclusionary rule also does not apply where the challenged evidence was obtained by an independent source or if such evidence would have been inevitably discovered. See Wayne R. LaFave, 5 *Search and Seizure: A Treatise on the Fourth Amendment,* 3rd edition § 11.4(a), at 236, 240. These exceptions serve to strike an appropriate balance between the competing societal interests in deterring police misconduct and in having juries receive all probative evidence by putting the police in the same position, rather than a worse position, than they would have been absent a violation. *Nix v. Williams,* 467 U.S. 431, 443–44, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984); *Murray,* 487 U.S. at 537, 108 S.Ct. at 2533.

**B. The Court May Excise the Tainted Portions From the Warrant Affidavit**

The law does not support David's contention that the firearms should be suppressed merely because the allegedly unlawful discovery of the firearm from Bob's Gun Shop was recited in the search warrant affidavit. Indeed, the Fourth Circuit recently held that "even if an affidavit supporting a search warrant is based in part on some illegal evidence, such inclusions of illegal evidence does not taint the entire warrant if it is otherwise properly supported by probable cause." *Simmons v. Poe,* 47 F.3d 1370, 1378 (4th Cir.1995) (citing *United States v. Smith,* 730 F.2d 1052, 1056 (6th Cir.1984); *United States v. Williams,* 633 F.2d 742, 745 (8th Cir.1980); *James v. United States,* 418 F.2d 1150, 1152 (D.C.Cir.1969)). "Thus, unless the tainted information is so important 'that probable cause did not exist without it,' the warrant will be deemed valid." *Simmons,* 47 F.3d at 1378 (citing *Smith,* 730 F.2d at 1056).

▮ In this case, after excising the allegedly tainted information from the search warrant affidavit and assuming that the remainder of the police investigation was wholly independent of the taint, probable cause would have existed for the issuance of the warrant.

The challenged search warrant was issued to permit the ATF to gather evidence of two different crimes: the unlawful receipt of firearms and the making of a material false statement. In regard to the latter charge, federal law requires that all persons applying to renew licenses must provide true and correct answers to ATF Form 8. The agents clearly had strong reason to believe that David falsely answered a question on ATF Form 8 to the effect that he was not presently under indictment. At oral argument, David's counsel conceded that these facts were not tainted.

Thus, David's objection, in reality, relates to the evidence seized in relation to the firearms' charge under 18 U.S.C. § 922(n), which makes it unlawful for a person who is under indictment for a felony to receive a firearm. This objection presents the question of whether, apart from the firearm found by UPS, probable cause existed for the issuance of a warrant to search for, and seize evidence related to, that offense.

▮ The record reflects that, as to that offense, the government agents had the following knowledge. David was indicted and Blanton was informed that UPS possessed two packages bound for Karl's Gun Shop. Both were from out-of-state gun shops. (Mosely Aff. at 4). The agents contacted Southern Ohio Gun and were told by its bookkeeper that the package bound for Karl's Gun Shop contained one Russian, Makarov, model PM, 9 × 18 caliber pistol, serial number 0080. Subsequently, Mosely posed as a UPS delivery person and delivered the two, above described, packages to Karl's Gun Shop. David paid for the delivery and signed for the packages. Later conversations between the agents and Southern Ohio Gun's bookkeeper revealed that, over the past few months, numerous firearms were ordered by Karl's Gun Shop and had been shipped there after the date upon which David was indicted. Thus, provided that the

controlled delivery and the agent's discussions with Southern Ohio Gun were wholly independent of the alleged illegal discovery of the firearm from Bob's Gun Shop, there existed probable cause to issue a warrant to search for documents and firearms relating to the unlawful receipt of firearms.[11]

David argues, however, that the controlled delivery and discussions with Southern Ohio Gun were not wholly independent of the illegal discovery. Thus, these facts could not have been used to support the search warrant and probable cause did not exist to search Karl's Gun Shop. Those arguments are rejected because, as explained below: (i) the investigation of David was not prompted by the presence of the firearm in the package opened by UPS; (ii) the search warrant was procured by evidence wholly independent of that discovery; and (iii) the seizure of the firearms was the product of a genuinely independent search. Furthermore, the firearms would have been inevitably discovered by lawful means.

## C. The Seizure of the Firearms was Genuinely Independent of the Unlawful Search

■ The exclusionary rule does not apply when the government "learn[s] of the [challenged] evidence from an independent source.'" *Wong Sun v. United States,* 371 U.S. at 487, 83 S.Ct. at 417 (citing *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319.) Although a "but for" causation relationship between the challenged evidence and the illegal conduct is not itself sufficient to justify suppression, if no such "but for" relationship exists, the evidence may be said to have come from an independent source. *See generally* Wayne R. LaFave, 5 *Search and Seizure, A Treatise on the Fourth Amendment,* 3rd Edition at 236 (citing *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417; *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)).

■ Applying these principles here, the court finds that the discovery of the firearm, even if illegal, was not the "but for" cause of the agents subsequent investigation of David. Nor did it provide the "but for" cause of the decision to seek the search warrant.

In *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), the Supreme Court found that the independent source doctrine could apply to evidence obtained pursuant to a search warrant when the evidence was first discovered during a prior illegal entry.[12] In *Murray,* federal agents conducted surveillance of Murray and others based on a tip from an informant. They observed Murray drive a truck into a warehouse and saw within the warehouse a tractor trailer bearing a long dark container. The truck Murray had been driving was turned over to another driver, was stopped and discovered to contain marijuana. After learning this information, the agents illegally entered the warehouse and observed burlapped wrapped bales in plain view. The officers then left the warehouse and applied for a search warrant. The application made no mention of the prior entry and did not rely on anything the agents observed during that entry. When the officers returned to the warehouse, they seized 270 bales of marijuana.

---

**11.** David's contention that because the government already had David's ATF Form 8 in their possession, no search warrant should have been issued is meritless. The government also sought documents relating to the unlawful receipt of firearms and federal regulations require federal firearm licensed dealers to keep records pertaining to the acquisition and disposition of firearms. See 27 CFR Part 178. David's contention that 18 U.S.C. § 925(b) allowed him to continue operating as a firearm dealer as long as his license was timely renewed also has no merit. Section 925(b), and its implementing regulations, "cannot be interpreted to create in a federal firearm's licensed dealer the right to operate under an existing license by filing a renewal application not in conformance with the Secretary's regulations which require, inter alia, disclosure of the fact of indictment." *David v. Mosley,* 915 F.Supp. 776 (E.D.Va.1996).

**12.** In *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), the Supreme Court had found that, although police officers had illegally entered private premises, evidence subsequently seized under a warrant need not be suppressed where the information on which the warrant was secured came from sources wholly unrelated to the initial entry and known to the agents before the entry.

The Supreme Court held that, even under these circumstances, "[s]o long as a later, lawful seizure is genuinely independent of an earlier, tainted one ... there is no reason why the independent source doctrine should not apply." *Id.* at 542, 108 S.Ct. at 2535. In so finding, the Court explained that a search is not genuinely independent "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Id.* at 542, 108 S.Ct. at 2536. *See also, United States v. Walton,* 56 F.3d 551, 554 (4th Cir.1995); *United States v. Curtis,* 931 F.2d 1011 (4th Cir.1991).

This case differs from *Murray* because the alleged illegally discovered firearm is not one of the firearms presently at issue in the motion to suppress. This case also differs from *Murray* because here the warrant was procured in order to permit a search of Karl's Gun Shop rather than to allow a re-search of the illegally opened package. Notwithstanding these differences, *Murray* provides a helpful way to analyze the present motion. Applying *Murray*'s principles, the court finds that the evidence of the illegally discovered firearm did not prompt the agents to conduct the subsequent investigation of David nor did it prompt them to obtain the search warrant. Thus, the alleged illegal search had no effect in the procurement of the warrant and the seizure of the firearms from Karl's Gun Shop was based on evidence obtained from a source genuinely independent of the alleged illegal search.

In so finding, the court notes that there is no prophylactic rule requiring the police to point to "historically verifiable fact demonstrating that the subsequent search pursuant to a warrant was wholly unaffected by the prior illegal search—e.g., that they had al-ready sought the warrant before entering the premises." *Murray* at 540 n. 2, 108 S.Ct. at 2535 n. 2. On the other hand, a court may not depend solely upon the testimonial assertions of the agents in deciding whether there is an independent source for the information on which the warrant was based. Accordingly, an assessment of all the facts is required and if the facts render the assertions implausible, the independent source doctrine would not apply. *Id.*[13]

The facts of the present action support the agents' assertions that their decision to further investigate David was not prompted by their discovery of the firearm in the alleged unlawful search. To begin, Mosely obtained permission to investigate David before the alleged illegal discovery. Also well before the package was opened by UPS, the agents knew that David had been indicted; that he had answered a government form untruthfully in that respect; and that federal law made it unlawful for persons indicted for a felony to receive a firearm. Based upon that knowledge, Blanton advised UPS of the ongoing investigation and the need to monitor packages. This sequence of events shows that the investigation of David after the alleged illegal search was simply a continuation of a previously instituted investigation. As part of the continuing investigation, the agents pursued a line of investigation wholly independent of the package from Bob's Gun Shop by inquiring of Southern Ohio Gun and Brownell's Inc. respecting packages emanating from those two sources. Thus, the investigation of David after the alleged illegal search was completely unrelated to the illegal search, and the facts uncovered thereunder. The court thus finds that the agents would have made the controlled delivery of the firearms from Southern Ohio Gun and would have communicated with that company

---

13. Admittedly, this case presents a more difficult question because the agents conducted the controlled delivery, spoke to the bookkeeper at Southern Ohio Gun, and applied for the search warrant only after the illegal search occurred. But, here the evidence does not make the agents' assertions (that they were not prompted to perform such actions by the illegal search) implausible. *c.f. United States v. Walton,* 56 F.3d 551 (4th Cir.1995) (finding that decision to seek war-rant was not prompted by illegal discovery of marijuana when agents investigated suspect for more than a year, observed movements for several days, followed a trail of marijuana from Texas, and began preparing search warrant affidavit prior to entry); *United States v. Curtis,* 931 F.2d 1011, 1013–14 (4th Cir.1991) (warrant was issued solely upon information known to officers prior to illegal entry and officer left to obtain warrant prior to illegal entry).

even if UPS had not opened the package from Bob's Gun Shop.

The facts also support the agents' assertions that they were not prompted by the illegal discovery of the weapon to obtain the search warrant. Most notably, the agents did not apply for the search warrant immediately after their illegal discovery. Rather, before pursuing such an application, they undertook an independent investigation of firearms ordered from a wholly different gun shop. Moreover, the warrant was not obtained by the agents to search the illegally opened package but was procured instead to search Karl's Gun Shop. Thus, the search warrant was not sought in order to sterilize the fruits of the prior tainted search. For these reasons, the court finds that the agents would have continued to investigate David and applied for the search warrant even had they not opened the package from Bob's Gun Shop. *See Murray*, 487 U.S. at 542 n. 3, 108 S.Ct. at 2536 n. 3 ("To determine whether the warrant was independent of the illegal entry, one must ask whether it would have been sought even if what actually happened had not occurred.")

■ The only remaining issue under *Murray* is whether the mention of the illegally discovered firearm in the affidavit "affected" the Magistrate Judge's decision to issue the search warrant. *Murray*, 487 U.S. at 542, 108 S.Ct. at 2536. There is no question that Mosely made reference to the alleged illegally discovered firearm in his search warrant affidavit. This could permit a finding that the search in this case was not entirely independent from the initial illegal search. The Fourth Circuit's application of *Murray* permits examination of the affidavit "absent the illegally-obtained information to determine whether the untainted portion of the affidavit set forth probable cause" even in a *Murray* context. *United States v. Walton*, 56 F.3d 551 (4th Cir.1995); *United States v. Gillenwaters*, 890 F.2d 679, 681–82 (4th Cir. 1989). Thus, having previously concluded that the evidence in the affidavit provides sufficient probable cause to support the

search warrant, even after excising references to the illegally discovered firearm, and having already concluded that such evidence was not so important that probable cause did not exist without it, the court also finds that the mention of the firearm from Bob's Gun Shop in the warrant did not "affect" the Magistrate Judge's decision to issue the warrant.

### D. The Firearms Seized Were Not Tainted by the Illegal Search

■ Even if it could be said that "but for" the discovery of the firearm in Bob's Gun Shop, the officers would neither have continued their investigation nor procured the search warrant, the court would not suppress the firearms at issue in this case because the seizure of those weapons was too attenuated to justify application of the exclusionary rule.

Deciding a question of attenuation requires "a close assessment of the facts of the particular case ... There is no litmus-paper test which can be applied here, and to some degree, the matter must be 'left to the informed discretion, good sense and fairness of the trial judge.'" LaFave, *supra*, § 11.4(f) at 294 (quoting *Alderman, v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)). Focusing on the "deterrence objective of the exclusionary rule [makes it] possible to derive a meaningful and relevant line of attenuation." *LaFave*, § 11.4(f) (quoting Comment, 115 U.Pa.L.Rev. 1136, 1148 (1967)).

In this case, David has not alleged that the illegal search formed the impetus of the investigation against him. Nor has he claimed that the subsequent investigation and search warrant "amounted to no more than a post hoc justification for using information that had already been illegally obtained." Lafave at 295 (quoting *United States v. Taheri*, 648 F.2d 598 (9th Cir.1981)).[14]

David contends that the illegal discovery provided the impetus for further investigation by the government. Thus, he argues

---

**14.** Of course, such assertions, even if made, could not withstand scrutiny because the record unequivocally shows that the agents had targeted

David as a suspect and obtained permission to investigate him before the alleged illegal search.

that, "but for" the discovery of the firearm in the illegal search, the agents would not have made the controlled delivery or the phone calls to Southern Ohio Gun or procured the warrant. It is well established, however, that a defendant may not prevail in a motion to suppress by simply alleging that "but for" the Fourth Amendment violation, certain evidence would not have been uncovered. *See* LaFave, *supra,* § 11.4(f) at 294. Indeed, the decision in *Wong Sun* dispels any notion to the contrary. In *Wong Sun,* 371 U.S. 471, 83 S.Ct. 407, the Supreme Court declined to adopt a rule of law that "all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Id.* at 488, 83 S.Ct. at 417.

Moreover, even if the opening of the package by UPS made the agents pursue their investigation of David with added zest, that should not forever immunize David from prosecution. *See United States v. Friedland,* 441 F.2d 855, 861 (2d Cir.), *cert. denied,* 404 U.S. 867, 92 S.Ct. 143, 30 L.Ed.2d 111 (1971) ("to grant life long immunity from investigation and prosecution simply because a violation of the Fourth Amendment first indicated to the police that a man was not the law abiding citizen he purported to be would stretch the exclusionary rule by beyond tolerable bounds"). At most, the alleged illegal search could be said to have "confirmed" the officers' pre-existing reasonable belief that David was engaged in criminal activity. However, confirmation that criminal activity is afoot does not establish that the firearms seized in this case were tainted. *See United States v. Pike,* 523 F.2d 734 (5th Cir.1975), *cert. denied,* 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976) (Neither the fact that the FBI's prior suspicions were confirmed by the illegal [ ] search, nor the inclusion of references to that search in the affidavit supporting the federal warrant, ipso facto, establishes the taint urged by [the suspect] ).

Thus, even if the court were to accept David's argument that, "but for" the discovery of the firearm in the illegal search, the agents would not have made the controlled delivery or conducted the subsequent investigation, or sought a search warrant, the Court

would still not grant the motion to suppress. At the most, the alleged illegal search confirmed the agent's suspicions of David. Thus, the court finds that the seizure of the firearms was so attenuated to the illegal search that the taint was dissipated.

### E. The Firearms Would Have Been Inevitably Discovered by Lawful Means

Even if the firearms were not seized pursuant to an independent source, they would have been inevitably discovered. The Supreme Court in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) adopted the inevitable discovery doctrine pursuant to which evidence unlawfully obtained may be admitted if the prosecution "establish[es] by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id.* at 444, 104 S.Ct. at 2509.

In the Fourth Circuit, "the premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence. Only then, if it can be shown that the taint did not extend to the second search, would the product of the second search be admissible." *United States v. Whitehorn,* 813 F.2d 646, 650 n. 4 (4th Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 931 (1988); *accord United States v. Thomas,* 955 F.2d 207, 209 (4th Cir.1992). Moreover, "the doctrine requires the fact or likelihood that makes discovery inevitable arise from circumstances other than those disclosed by the illegal search itself." *Thomas,* 955 F.2d at 210.

The record here establishes that the discovery inevitably arose from circumstances other than those disclosed by the alleged illegal search. In other words, here the inevitable discovery arose not from opening the package from Bob's Gun Shop but from the facts that the agents were monitoring David's shipments and that David ordered firearms, on his own accord, rather than from some prompting by the agents. Thus, this case is not like *Thomas,* 955 F.2d 207, where the suspect cooperated only after the FBI questioned him about the illegally

discovered evidence. *Id.* at 210. Moreover, in this case, the investigation for the firearm violations had begun before the alleged illegal search and simply continued in the same manner that the officers would have proceeded had that search not occurred. This fact also distinguishes the present case from *Thomas* where the officers were originally investigating the suspect for drug trafficking but focused instead on investigating a bank robbery after illegally discovering money in the suspects' hotel room.

Finally, the alleged "illegal search" of the package from Bob's Gun Shop played no real part in [the] discovery of the "incriminating evidence" ordered by, and sent to, David from Southern Ohio Gun. Indeed, the transactions were wholly unconnected. Nor was there any exploitation by the agents of the alleged illegal search. Even though this case does not present facts as persuasive as those in *Whitehorn*, where agents were taking steps to obtain a warrant before the illegal search, the prosecution is not required to show that before the alleged misconduct, the police were actively pursuing an alternate line of investigation. *Thomas*, 955 F.2d 207, 210 (4th Cir.1992) (rejecting the three prong test established by *United States v. Cherry*, 759 F.2d 1196 (5th Cir.1985), and adopted by the Eleventh Circuit in *United States v. Hernandez–Cano*, 808 F.2d 779, 784 (11th Cir.), *cert. denied*, 482 U.S. 918, 107 S.Ct. 3194, 96 L.Ed.2d 682 (1987)).[15]

Even if one were to disagree with the conclusion that the facts making the discovery inevitable did not arise under the alleged illegal search, there remains another reason why the firearms would inevitably have been seized in the present case. As a federally licensed firearms dealer, David was required to maintain records of the acquisition and disposition of all firearms and the agents could contact any federally licensed firearms dealer who sent David a package and inspect their transfer records. An inspection of that

sort would have shown that David, while under indictment for a felony, was receiving firearms. A search warrant could be authorized on the basis of that information.

To suppress the firearms in this case would, contrary to Supreme Court teachings, put the police in a worse position rather than the same position they would have been in had no police error occurred. *Murray*, 487 U.S. at 537, 108 S.Ct. at 2533 (quoting *Nix*, 467 U.S. at 443, 104 S.Ct. at 2509). And for the foregoing reasons, the court denies David's motion to suppress.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

---

**15.** These circuits require a showing that "the prosecution [must] demonstrate (1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct; (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct; and (3) that the police also prior to the misconduct were actively pursuing the alternate line of investigation."